UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )  )  v.   )  )  SCOTT F. McCREADIE   ) | Cr. No. 04-10338 |

### SENTENCING MEMORANDUM

On January 18, 2005, Scott F. McCreadie ("the defendant") pleaded guilty to a three count Information charging him with one count of willfully violating Section 10(b) of the Securities Exchange Act of 1934 and two counts of tax evasion in violation of 26 U.S.C. § 7201.  This court has not yet sentenced the defendant.  In a Pre-Sentence Investigation Report ("PSR") submitted to the court, the United States Probation Office concluded that, in accordance with the United States Sentencing Guidelines, the defendant's total offense level would be 19.  A total offense level of 19 coupled with a criminal history category of I would yield a guideline sentencing range of 30 to 37 months in prison.  The defendant does not contest the defendant's total offense level or the PSR's calculations.  The PSR, however, fails to consider the recent decision of United States v. Booker, 125 S. Ct. 738 (2005) where the United States Supreme Court held that the Sentencing Guidelines no longer impose a mandatory burden on the federal courts.  Although district courts must consider the Guidelines as "guidelines" in their sentencing decisions, courts are no longer required to impose a sentence within the mechanistic strictures of the statutory grid.  Rather, courts are free to consider a wide range of factors when deriving the appropriate sentence including the history and characteristics of the individual defendant.  Id. at 770.

Here, the history, characteristics, and unique circumstances of this defendant warrant a

sentence of six months in prison and six months home confinement. For reasons detailed in this sentencing memorandum, several factors warrant a sentence below the advisory guideline range as described in the PSR. Specifically, when the defendant committed the instant offenses, he was suffering through an agonizingly painful ordeal of caring for a wife stricken with a brain tumor. The pressure of caring for his ailing wife, raising his two infant children, and managing a stressful financial services position at a Wall Street firm clearly clouded his judgment. Although the defendant offers no excuses and accepts full responsibility for the wrongfulness of his conduct, the defendant submits that the court should consider the difficulty of his circumstances when fashioning an appropriate sentence. Under the former mandatory guideline system, the defendant would have been permitted to argue that his unique situation and extraordinary circumstances fell outside the heartland of the guidelines for the particular offenses for which he stood convicted and provided a basis for a downward departure from the somewhat inflexible guideline range. In the wake of Booker, these "humanizing" factors now emerge as critical components of the court's less restrictive sentencing analysis.

**FACTS AND BACKGROUND**

When faced with adversity, some people demonstrate the strength of their mettle and character. Others lack an ability to cope with hardship and turn self-destructive. These individuals often make decisions that hurt not only themselves but also their closest family members. Unfortunately, the defendant falls into the latter category.

Until the defendant reached his late 20's, he never experienced hardship or significant challenges. Born on September 9, 1970 into a stable two-parent upper middle class home, the defendant's childhood in suburban Norwood, Massachusetts was relatively sheltered. School, sports, family, and friends encompassed the defendant's life. After graduating from Norwood

2

Senior High School in 1988, the defendant enrolled in college. Although severe learning disabilities delayed his attainment of a bachelor's degree at Mount Ida College until 1999, the defendant's life certainly was not atypical of any other child of a two-parent home in a relatively upscale suburb of Boston.

In 1993, the defendant developed a serious dating relationship with Jodie Maltz. The couple married on April 30, 1995 and relocated to Sharon, Massachusetts. In 1996, the couple had their first child, a daughter, who they named Kayla. During this time, the defendant worked for Putnam Investments. His income was sound. His marriage was solid. His family life was exultant.

In 1998, illness jolted the defendant's family bliss. Shortly after his wife delivered their second child, Adam, she experienced a seizure. Doctors determined that Jodie suffered from a brain tumor that would require surgery. As months passed, Jodie grew increasingly ill. The possibility existed that she could die. His wife's illness consumed the defendant during this period of time. The defendant maintains that he loved his wife. She was his life, and the defendant could not cope with her illness.

Eventually, Jodie elected to have surgery to remove the brain tumor. Although the operation was successful, the procedure left her partially paralyzed. She spent extended periods of time in the hospital and rehabilitation center. She finally returned home confined to a wheelchair. Although the defendant's father-in-law, Stanley Maltz, paid for a nanny to care for the children, the defendant also had a primary role in caring for his children and his ailing wife.

During this time period, the defendant took a job as a financial advisor with UBS Paine Webber in Boston. Paine Webber hired the defendant despite the fact that he had virtually no training, experience, or relevant background in the financial services arena. The high finance

job required long, sometimes brutal, hours. The stress of working a full-time job, caring for two children, and tending to a wife with a serious illness began to take an emotional toll on the defendant. Although he attempted to perform his multiple roles effectively, the defendant soon discovered that he was overwhelmed.

The defendant's problems compounded when his father-in-law entrusted him with the Maltz family accounts. Jodie Maltz's father, Stanley, owned a floor covering business known as Continental Carpet. In 1995, Stanley Maltz sold his floor covering business for roughly $6.5 million. In October of 1999, after his son-in-law accepted a position at Paine Webber, Stanley Maltz transferred his family's accounts, including trust funds he established for his grandchildren, to the defendant. The defendant, as a fledgling financial advisor, suddenly had custodianship of accounts and funds worth several million dollars. He was clearly "in over his head."

As a caretaker expected to yield a favorable monetary return for his family, the defendant was ill-equipped for the job. Despite his lack of knowledge, the defendant did not want to disappoint his family. When one of his family member's accounts failed to meet expectations, however, the defendant's problems began. In an ill-advised attempt to make up for his short comings as a money manager, the defendant, without authorization, shuffled funds from his family's accounts into various outlets. He funneled much of the funds into stocks. During the economic boom of the late-1990's, the stock market flourished and stock trading appeared like a wise method of making money especially to someone with minimal experience in the industry. The defendant could not have been more wrong about his market expectations. From 2000 to 2002, the market, in general, worsened and technology stocks, in particular, capsized. Unable to make prudent investment choices and too inexperienced to pursue corrective strategies, the

defendant succeeded only in depleting his family's accounts and trust funds. At the same time, the defendant began to divert the money under his management to himself. While this was neither authorized nor permitted, the defendant truly believed, albeit erroneously, that the market would eventually yield a high enough rate of return to allow him to repay the funds he had taken. While the defendant accepts full responsibility for the wrongfulness of his conduct, he maintains that he never intended to harm his family. The defendant insists that he diverted the money to himself only to allow his infirm wife to maintain her lifestyle. The fact that he wound up hurting the one person who meant more to him than anything has caused him immense personal suffering and regret.

When she discovered that the defendant had depleted her family's accounts, Jodie Maltz left her husband. She obtained a divorce in 2003 and has since remarried. All at once, the defendant lost both his wife and his children. The Maltz family disowned him. He lost his job at Paine Webber. He lost his home. He lost his reputation and the respect of his colleagues. Broken and without employment, the defendant moved in with his parents in Florida.

In the intervening years, the defendant has attempted to reclaim his life. With weekend and holiday custody of his two children, the defendant cherishes his role as a father. Not only does he care for his children, he never misses a child support payment. The defendant's life, however, contains constant reminders of the damage that he inflicted upon the Maltz family, his wife, his children and, ultimately, himself. Remorse and regret haunt him. He has declined to contest the revocation of his broker's license and has neither the inclination, nor the desire, to work in the financial services industry again. In order to meet his obligations as a father, and as an ex-husband, he has started life again as a used car salesman. He insists he has learned from this egregious error in judgment and vows to reclaim the honest, upright life he lived for over 25

years. He accepts complete and full responsibility for the harm he has done.

## **ARGUMENT**

A. <u>The United States Supreme Court's Booker/Fanfan Decision Has Rendered The Sentencing Guidelines Advisory</u>

On January 12, 2005, the United States Supreme Court issued its landmark <u>United States v. Booker</u>, 125 S. Ct. 138 (2005), decision. In <u>Booker</u>, the Supreme Court held that the principles announced in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004), apply to the United States Sentencing Guidelines. <u>Blakely</u>, a case interpreting the Supreme Court's earlier decision in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), held that within a mandatory sentencing scheme where offense levels exist, the Sixth Amendment to the United States Constitution requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Blakely</u>, 124 S. Ct. at 2537 (quoting <u>Apprendi</u>, 530 U.S. at 490). The <u>Blakely</u> Court concluded that the 'statutory maximum' for *[Apprendi](#)* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" <u>Blakely</u>, 124 S. Ct. at 2537 (emphasis in original). <u>Booker</u> applies the <u>Blakely</u> Court's reasoning to the federal sentencing guidelines and holds that within the context of a mandatory sentencing system, the Sixth Amendment requires the government to prove any sentencing enhancement factors to a jury beyond a reasonable doubt. <u>Booker</u>, 125 S.Ct. at 749-750.

In a separate majority opinion, the <u>Booker</u> Court also declared that in light of its application of <u>Blakely</u> to the federal sentencing guidelines, the statutory provisions making the guidelines

6

mandatory upon the federal courts are unconstitutional. Booker, 125 S. Ct. at 756-57. Hence, the sentencing guidelines are now advisory. Booker, 125 S.Ct. at 757; United States v. Sahlin, 399 F.3d 27, 30-31 (1st Cir. 2005). Although courts must still consider guideline ranges, they are also free to tailor the sentence in light of other statutory concerns such as the history and circumstances of the defendant. Booker, 125 S. Ct. at 757 (citing 18 U.S.C. § 3553(a) (Supp. 2004)). Rather than adhere to a strict and impersonal arithmetical formula, court must now derive a sentence that is reasonable given a host of factors including the defendant's record, the nature of the crime, and the facts and circumstances germane to each case. See Booker, 125 S. Ct. at 766-67.

  B. The Defendant's Circumstances Favor A Split Sentence

Booker allows courts the freedom to consider issues unmentioned or disfavored by the Sentencing Guidelines without meeting the rigidity of the former downward departure regime. See, e.g., United States v. Heldeman, 2005 WL 708397, at *3 (1st Cir. March 29, 2005). This case is replete with issues warranting the court's consideration of a split six and six sentence.

First, the defendant committed the instant offenses during an exceptionally trying period in his life. As the defendant began a new job as a financial analyst at Paine Webber, his wife suffered a brain tumor and faced the prospect of death. Even after her operation to remove the tumor, she laid partially paralyzed at home. Caring for her, raising his two young children, and meeting the demands of a private sector financial services job proved far too onerous for the defendant. The defendant exercised poor judgment during a time of personal crisis.

In a sense, the defendant's behavior was aberrant. For almost thirty years, the defendant never committed a crime and had no blemishes on his record. Following this prosecution, the defendant has resumed a tattered life as an honest citizen. Nothing suggests that he poses the

slightest risk of recidivism. The defendant simply utilized bad judgment during an agonizing and overwhelming moment where human frailty trumped common sense.

A related second reason favoring a split sentence is that the defendant never intended to hurt his family. The defendant became the caretaker of a multimillion dollar project when he had little or no financial advisory background. Although the defendant should have recognized his own limitations, Paine Webber was negligent in hiring someone without the proper experience, education, or training to fill an executive Wall Street financial services position. Placing the defendant or someone like him in a role such as stewarding multimillion dollar family trusts through the marketplace risked this situation where an advisor would become overwhelmed, panic, and resort to activity that crossed legal boundaries.

Ironically, the defendant feared disappointing his family. He wanted to increase their money. He wanted to provide lavish things for his ailing wife. The inexperienced and unqualified financial advisor simply did not know how to extricate himself once he took his first illegal action. In the end, the defendant succeeded in hurting the people who he most wanted to impress with his financial skills. The defendant clearly never intended the end result.

The end result not only hurt the defendant's family, it wrought serious consequences upon the defendant. In fact, the third reason compelling a split sentence here is the so-called collateral consequences suffered by the defendant. It is worth noting that the victims whose accounts the defendant depleted are now whole. Paine Webber replenished the Maltz family accounts.[1]

---

[1] In her victim impact statement, the defendant's former mother-in-law states that her four grandchildren's college funds are missing approximately $400,000.00 total. The PSR notes that the Maltz family has produced no evidence in support of its assertion. (See PSR at 7, ¶23.) The PSR also raises the obvious question as to why the Paine Webber reimbursement did not cover the grandchildren's college funds. (Id.) Given the absence of proof, the court should not consider the mother-in-law's assertions when imposing sentence.

Happily for the Maltz family, the defendant's actions did not have a lasting impact. The converse, however, describes the defendant's life. Quite simply, the defendant lost everything. His wife, who he cared for night and day during her illness, left him. His in-laws disowned him. He lost his opportunity to see his children on daily basis. The defendant lost his home and moved in with his parents. He lost his job and the respect that he earned at work. This defendant, who overcame severe learning disabilities to earn a bachelor's degree at Mount Ida College and obtain a financial advisory position with a Wall Street firm, lost his life's work. The defendant has suffered immensely for his mistakes. Regret and remorse are twin demons that haunt him on a daily basis. Compounding the defendant's suffering with an extended prison sentence will foster neither justice nor fairness. The court, therefore, should sentence the defendant to six months in prison and six months of home confinement.

  C.  <u>The Court Should Impose a Sentence Consistent with the Plea Agreement</u>

Prior to the plea hearing in this case, the government and the defendant bargained and reached a written agreement whereby the defendant agreed to plead guilty to one count of securities fraud and two counts of tax fraud subject to certain stipulations by the government. (<u>See</u> Plea Agreement, attached as to PSR.) In the plea agreement, the defendant and the government agreed that the defendant's base offense level would be 19, which, with a criminal history category of I, yields a guideline range of 30 to 37 months. (<u>Id.</u>) The government agreed to ask the court for a sentence of 30 months, which represents the low end of the formerly mandatory guideline system.

The defendant signed the plea agreement on October 18, 2004. He predicated his plea on the reasonable likelihood that he would be eligible to serve his sentence in Intensive Community Confinement ("ICC"). Although the government did not recommend ICC placement in the plea agreement, it agreed not to oppose the defendant's request that he serve his sentence in an ICC

facility. As the court is aware, ICC, which was also known as boot camp, was a process where young, non-violent first-time offenders would serve their sentences in a military style boot camp designed to rehabilitate the offender and ultimately restore self-esteem. As a young, healthy, non-violent, first time offender, the defendant stood as the ideal candidate for boot camp.

As late as October and November of 2004, the BOP scheduled boot camp classes for 2005. In fact, around the time the defendant signed the plea agreement, the BOP specifically informed the defendant's attorneys that the next scheduled boot camp would begin on February 14, 2005 at Lewisburg, Pennsylvania. Unexpectedly, in January of 2005, three months after the defendant had singed his plea agreement, the Bureau of Prisons ("BOP") discontinued the boot camp. BOP has no plans to restore it in the near future.[2] The BOP's decision removes a key ingredient upon which the defendant premised the plea agreement.

While the plea agreement acknowledges that sentencing remains within the sound discretion of the district court, the defendant did bargain for this agreement with the anticipation that the court would enforce it and recommend boot camp. Now, the foundation of the plea agreement no longer exists. The defendant certainly does <u>not</u> wish to withdraw his plea or rescind the plea agreement. Rather, he asks the court to impose a sentence approximating or equivalent to the ICC confinement period.

Entering into his agreement, the defendant anticipated a sentence of 30 months with a

---

[2] In fairness to the government, Assistant United States Attorney Jack Pirozzolo called counsel for the defendant in December of 2004 to alert him about the possibility that the boot camps would be discontinued. Having previously received confirmation from the Bureau of Prisons about the February 14th class at USP Lewisburg, however, defense counsel proceeded to schedule a change of plea hearing with the hope that the BOP ultimately would not decide to phase out the ICC program. During the actual change of plea hearing held on January 18, 2005, the United States Probation Office confirmed that the BOP's decision to terminate the ICC program was final.

recommendation for boot camp from the court. If the court had issued such a recommendation, the BOP would have released the defendant to a half-way house or home confinement following his completion of the boot camp in six months. Essentially, the defendant bargained for a six month sentence and the court should impose a sentence consistent with the defendant's bargain. A sentence consistent with the plea bargain would be six months in prison with six months in home confinement.

Principles of due process and fundamental fairness require that a defendant receive the benefit of his bargain absent some countervailing measure disfavoring enforcement. In an advisory guideline's system where the court is free from the previous mandatory constraints of the pre-<u>Booker</u> sentencing regime, the court has unfettered discretion to enforce a plea bargain. Unless this plea bargain does violence to the factors enumerated in 18 U.S.C. § 3553(a), the court should enforce it. As this agreement runs consistent with the section 3553(a) factors, the court should grant the defendant his approximate bargained-for result and sentence him to serve a split sentence.

## **CONCLUSION**

For the foregoing reasons, the court should sentence the defendant to serve six months in the custody of the Bureau of Prisons and six-months of home confinement.

Dated: April 2, 2005

Respectfully submitted,

SCOTT McCREADIE,
By his attorneys,

/s/ Brad Bailey
_____
Jeffrey A. Denner, BBO#120520
Brad Bailey, BBO#549749
Gary G. Pelletier, BBO#631732
DENNER O'MALLEY, LLP

Four Longfellow Place, 35th Floor
Boston, MA 02114
(617) 227-2800

<u>Certificate of Service</u>

I, Brad Bailey, certify that on April 2, 2005, I served a copy of the within Sentencing Memorandum upon Assistant United States Attorney Jack Pirozzolo by electronic mail and upon United States Probation Officer Susan Walls by electronic mail.

/s/ **Brad Bailey**
_____
Brad Bailey